542 Pa. 614 (1996)
669 A.2d 338
Judith M. WILSON
v.
WORKMEN'S COMPENSATION APPEAL BOARD (ALUMINUM COMPANY OF AMERICA).
Appeal of ALUMINUM COMPANY OF AMERICA.
Supreme Court of Pennsylvania.
Argued September 20, 1995.
Decided January 18, 1996.
Reargument Denied April 24, 1996.[*]
*615 *616 Patricia L. Wozniak, Pittsburgh, Mary Ellen Krober, Philadelphia, Mark J. Neuberger, Pittsburgh, for Aluminum Co.
Judith M. Wilson, Pro Se, Ernest D. Preate, Jr., Harrisburg, Sara J. Klein, Pittsburgh, Edward Jaffee Abes, Pittsburgh, for Judith Wilson.

OPINION
ZAPPALA, Justice.
This is an appeal by Aluminum Company of America (Alcoa) from the opinion and order of the Commonwealth Court *617 reversing the order of the Workmen's Compensation Appeal Board (Board) denying benefits to Judith Wilson for a psychic injury claimed to have been caused by her employment with Alcoa.[1] We reverse and reinstate the Board's order denying benefits.
On May 21, 1990, Wilson filed a claim petition seeking workers' compensation benefits for severe depression suffered due to stress in her employment with Alcoa. The claim petition was dismissed on February 12, 1992, after evidentiary hearings before a referee.[2] The referee concluded that Wilson had failed to establish that her psychic injury was caused by abnormal working conditions. The Board affirmed the referee's decision and denied Wilson's appeal on the basis that there was ample, substantial and competent evidence to support the referee's conclusion. The Commonwealth Court determined that changes in Wilson's employment conditions and status constituted abnormal working conditions that caused Wilson's psychic injury and reversed.
Alcoa filed an application for reargument with the Commonwealth Court on November 5, 1993. The application was denied. Alcoa then requested a supersedeas from the Commonwealth Court pending disposition of its petition for allowance of appeal which was filed with this Court. On January 31, 1994, Senior Judge Narick entered an order granting the request pending disposition of the allocatur petition. After allocatur was granted, Judge Narick entered an order granting a supersedeas to Alcoa while the matter was on appeal.
The scope of appellate review is limited in workers' compensation proceedings to a determination of whether constitutional rights have been violated, an error of law has been committed, or any findings of fact are supported by substantial evidence. Volterano v. Workmen's Compensation Appeal Board, 536 Pa. 335, 639 A.2d 453 (1994). Alcoa asserts that *618 the Commonwealth Court's decision exceeded the scope of appellate review by refusing to accept credibility determinations made by the referee that were supported by the evidence, and that Wilson failed to meet her burden of proof to recover workers' compensation benefits for a psychic injury.
To recover workers' compensation benefits for a psychic injury, a claimant must prove by objective evidence that he has suffered a psychic injury and that such injury is other than a subjective reaction to normal working conditions. Martin v. Ketchum, Inc., 523 Pa. 509, 568 A.2d 159 (1990), quoting Russella v. Workmen's Compensation Appeal Board, 91 Pa.Cmwlth. 471, 497 A.2d 290 (1985). The claimant is required to produce evidence that the psychic injury was caused by other than normal working conditions. This approach recognizes the highly subjective nature of psychic injuries and requires that the occurrence of the injury and its cause be adequately established.
In Martin, we rejected the appellant's argument that a claimant should not be required to prove that a psychic injury was caused by abnormal working conditions in order to be compensable. We stated that
Abandoning the distinction between normal and abnormal working conditions, as the Appellant urges us to do, would eliminate the element of causation. It would destroy the fundamental principle underlying the scheme of the Workmen's Compensation Act  that, in order to be compensable, an injury must be work-related. Under Appellant's theory, a claimant would have to establish only that the employee suffered from a mental illness while employed and that the illness was a condition created or aggravated by that employee's perception of the conditions of his employment. That would reduce workmen's compensation benefits to nothing more than a disability or death benefit payable only because of the employee status of the claimant  and not because the injury was caused by his employment
523 Pa. at 519-20, 568 A.2d at 165.
The record in this case establishes that Wilson was employed at Alcoa from February 23, 1962, to August 14, 1987. *619 During that time, she worked in a number of departments as a secretary. Wilson became an administrative assistant for Mr. Barstow, a company executive. When Barstow was promoted to public relations and advertising in 1981, she continued to be his assistant. She was assigned also to work for a second executive at that time. Her secretarial duties were expanded to include scheduling reservations for the corporate box at Pittsburgh's Three Rivers Stadium and lodge facilities located in Tennessee, and coordinating farewell parties for retiring executives.
Four years later, Barstow was transferred to a position in Mexico City. When Barstow moved to Mexico, Wilson took a leave of absence for four months reportedly for health reasons. Wilson returned to Alcoa in October of 1985. Barstow's transfer had eliminated the need for his administrative assistant, so Wilson no longer had a full-time assignment. She met with Anna Mae Litman, the personnel manager for the corporate headquarters staff, to discuss her future.
On July 1, 1985, Alcoa had implemented a program for posting career opportunities within the company. While on leave of absence, Wilson was sent a letter dated June 24, 1985, that explained the program and encouraged her to take advantage of it. Wilson was unsuccessful in securing another job after her position was eliminated, but Alcoa did not terminate her employment.
Instead, Alcoa offered her an opportunity to work on temporary assignments as a "floater." The temporary assignments served the purpose of giving displaced employees additional time to secure a more permanent position within the company. The personnel department utilized floaters to fill assignments expected to last for a number of weeks. Outside agencies were contacted for shorter assignments.
Floaters performed routine clerical functions that did not require additional training, including filing, answering phones, scheduling appointments, and opening mail. Because of the short duration of the assignments, the work was more structured and required fewer administrative skills.
*620 Alcoa was undergoing continual reorganization and decentralization at the time. During the period from October 1985 to September 1987, there were as many as six displaced clerical employees working as floaters. Ruth Bass, the personnel manager's assistant, administered the floater program. Floaters did not have a centralized office of their own. Instead, a floater would report to the department of Alcoa where assistance was needed. The work space for a floater could be either an office or a bullpen area with more than one individual sharing the space. A floater had use of a desk, and exclusive use of a telephone depended on the number of people in the work area.
Wilson became a floater in October 1985 and worked for the Alcoa Foundation for three months. Beginning in February 1986, Wilson was assigned to work for the Alcoa Library under the supervision of Norm Belt and Kristen Henson. She typed transcripts of audiotapes that had been composed by a consulting group for a book commemorating Alcoa's 100th anniversary.
The assignment lasted for a period of six months. The personnel department requested that Kristen Henson complete an evaluation of Wilson's performance in June 1986. Henson indicated that Wilson's work was done well, but expressed concern about the progress of the project. Wilson had been working in an office on the third floor, two floors above the library. Henson and her superiors concluded that more direct supervision was necessary.
They met with Wilson to discuss her performance review and informed her of the personnel department's decision to move her to a room that was adjacent to the library on the third floor. The move would enable Henson to monitor the work on the project. Wilson was upset and did not want to move from the third floor office. Wilson was taken off the project shortly thereafter.[3]
*621 In August 1986, Wilson was assigned to the Systems Engineering Integrated Department (SEI). She worked there until the department was eliminated at the end of May 1987. SEI was relocated to Warrendale, Pennsylvania, but the employment of some department members was terminated.
Litman met with Wilson on May 27, 1987, to discuss her options once again. Wilson indicated that she did not want to be a floater. Litman continued to encourage Wilson to apply for jobs that were posted through the career opportunities program. Wilson was told that she would be laid off if no job was available.
On May 29, 1987, Wilson sent a letter to Litman in which she reemphasized that she wished to continue her employment with Alcoa "provid[ed] it was a meaningful position similar to [her] job classification (Administrative Assistant)." She described her employment history with the company in great detail. Wilson was critical of the job posting program and complained that jobs that opened up and fit her talents were "filled by some means outside the system."[4] She concluded her letter by writing, "From our recent conversation, you are really telling me that there is nothing for me at Alcoa, despite the fact that I am still interested in working for Alcoa."
Litman brought the letter to the attention of her supervisor, Linwood Butler, and discussed what could be done for displaced *622 employees who had worked a long time for Alcoa and performed well. The management committee's response was to institute a system that would permit an employee to bump someone with less seniority in the same business unit. The system was instituted as of June 17, 1987.
Litman discussed this change in Alcoa's policy with Wilson. She presented Wilson with three options: (1) that Wilson could work with the SEI group in Warrendale; (2) that she could wait for a position with Alcoa Steamship, a division that was being relocated from New York City to Pittsburgh; or (3) that she could bump into a job in the purchasing department, titled as "Administrative Assistant, Raw Materials Procurement," which would require computer training. Wilson became hysterical and her husband was contacted. After her husband arrived, Wilson left with a description of the available job. She was to consider her options, while she was on vacation for the next three weeks, and respond to Litman by August 13, 1987.
August 13 passed without any response from Wilson. When Litman was unable to reach Wilson at home, she spoke to her supervisor. The supervisor was informed by Wilson's husband that Wilson had chosen an office for herself on the fifth floor of the Alcoa building.[5] Litman drafted a letter to Wilson, dated August 17, 1987, stating that if she declined the administrative specialist position, it would be considered as a refusal of suitable employment, and she would be released from employment effective August 19, 1987. The letter was sent by Federal Express to Wilson's home. No response was forthcoming and Wilson's position was terminated.[6]
*623 On September 9, 1987, Wilson began treatment with Dr. Deborah Greenwald, a psychologist. Dr. Greenwald diagnosed Wilson as suffering from major depression. In her deposition testimony of December 4, 1990, Dr. Greenwald indicated that Wilson had made very slow progress during the three-year period of treatment and was moderately depressed. Dr. Greenwald concluded that work was the source of her self-esteem and that Wilson's problems began in 1985 with the loss of her position when her boss was transferred to Mexico. Wilson experienced a loss of responsibilities and social contacts as a result.
Wilson was described by Dr. Greenwald as an overachiever who had a workaholic style and as one who was very dependent upon other people's evaluation of her. Dr. Edward Friedman, a Board-certified psychiatrist who testified as an expert for Alcoa, described Wilson much the same way. He concluded, however, that those personality traits render her more susceptible to psychic injury from what might be common workplace occurrences.
The referee determined that Wilson had not been treated in an improper manner by Alcoa after her boss was transferred out of the country. In his finding of facts, the referee stated:
17. No evidence is found that the claimant has received any type of verbal abuse or harassment.
18. It is found that the claimant has been exposed to certain situations that she perceives as being demeaning and job-threatening, which have, in fact, resulted in her depression.
19. Claimant has not been exposed in the workplace to abnormal working conditions.
The referee concluded that Wilson had not been faced with abnormal workings conditions. He dismissed the claim petition because Wilson had failed to establish that her psychic injury was caused by abnormal working conditions and not merely a perception of such.
*624 The issue in this appeal is whether there was sufficient evidence to prove that the psychic injury suffered by Wilson was caused by abnormal working conditions.[7] The question of whether specific working conditions amount to abnormal working conditions has been variously described as "a mixed question of law and fact," Parson v. Workmen's Compensation Appeal Board, 164 Pa.Cmwlth. 165, 642 A.2d 579 (1994), or as one of law, Archer v. Workmen's Compensation Appeal Board, 138 Pa.Cmwlth. 309, 587 A.2d 901 (1991).
We recognize that psychic injury cases are highly fact-sensitive and for actual work conditions to be considered abnormal, they must be considered in the context of the specific employment. Volterano, supra. Where, as here, the Board has taken no additional testimony, appellate review of the referee's findings of fact regarding the claimant's employment is limited to a determination of whether the findings are supported by the evidence as a whole and will be overturned only if arbitrary and capricious. Bethenergy Mines v. Workmen's Compensation Appeal Board, 531 Pa. 287, 612 A.2d 434 (1992). Whether the facts as found by the referee support a conclusion that the claimant has been exposed to abnormal working conditions is a question of law, however, that is reviewable on appeal.
In this case, the Commonwealth Court held that the Board and referee erred in concluding that Wilson was not subjected to abnormal working conditions. The court reasoned that the changes in Wilson's job responsibilities and her status after she became a floater and the events that led to the termination of her employment constituted abnormal conditions. The court concluded that Wilson's psychic injury was caused by those abnormal conditions and reversed the Board's order denying benefits.
Alcoa contends that the decision is inconsistent with this Court's opinion in Martin and prior caselaw of the Commonwealth Court which held that a decrease in job responsibilities *625 does not constitute an abnormal working condition. Wilson argues that the two-prong test established in Martin was satisfied, and that she would still be entitled to workers' compensation benefits even if this Court should find that she failed to prove the existence of abnormal working conditions. Wilson asserts that she met the second part of the Martin test, even if her working conditions are found to be normal working conditions, because she has proven with objective evidence that there were actual work events that caused her psychic injury.
We find that the Commonwealth Court erred in holding that Wilson was subjected to abnormal working conditions. Wilson has identified actual employment events that occurred after her administrative assistant position was eliminated due to the transfer of her boss, but has failed to establish that the events were abnormal working conditions. An abnormal working condition is not established by evidence that a displaced employee was unable to obtain an identical job with his same employer. We reject the interpretation of Martin suggested by Wilson that would allow any change in the status quo of an employment situation to be compensable simply because a claimant established that the change was actual, rather than imagined or perceived, and resulted in psychic injury.
In Martin, a fatal claim petition was filed by the widow of Charles Martin alleging that her husband had committed suicide due to job-related stress. Martin was employed as a professional fundraiser for nonprofit organizations and was assigned to handle a campaign for the University of Michigan. He experienced problems with the campaign due in part to conflicts with the University's Vice President of Development and became dissatisfied with his staff, office, and campaign progress. Martin was subsequently reassigned to a different campaign that was less prestigious. Although his employer's perception of Martin as a successful fund-raiser did not change, Martin's self-esteem faltered. He later committed suicide.
*626 The referee granted benefits to the widow finding that Martin had suffered work-related stress which resulted in his suicide. The Commonwealth Court reversed because the events preceding the suicide did not constitute abnormal working conditions. We affirmed the Commonwealth Court and adopted the two-prong test which requires a claimant to prove by objective evidence that he has suffered a psychic injury and that the injury is other than a subjective reaction to normal working conditions to recover benefits.
We explained that the phraseology, "abnormal working conditions," describes the requirement that the claimant prove that the psychic injury is in fact a work-related injury. The requirement is an objective one, rather than subjective. Thus, a claimant may not recover benefits for psychic injuries that arise from subjective reactions to normal working conditions. Martin, 523 Pa. 509, 517-19, 568 A.2d 159, 164 (1990).
Martin's reassignment from a major campaign project to a smaller project was an actual employment event, the occurrence of which was undisputed.[8] The change in responsibilities did not constitute an abnormal working condition, however. Thus, we concluded that Martin's suicide was not caused by his employment, but rather by his failure to meet self-imposed expectations.
"[E]ven if a claimant adequately identifies actual (not merely perceived or imagined) employment events which have precipitated psychiatric injury, the claimant must still prove the events to be abnormal before he can recover." Antus v. Workmen's Compensation Appeal Board, 155 Pa.Cmwlth. 576, 586, 625 A.2d 760, 766 (1993), aff'd per curiam, 536 Pa. 267, *627 639 A.2d 20 (1994). See also, Pate v. Workmen's Compensation Appeal Board, 104 Pa.Cmwlth. 481, 522 A.2d 166 (1987), allocatur denied, 517 Pa. 611, 536 A.2d 1335 (1987).
The Commonwealth Court has held in a line of cases that the loss of employment is not an abnormal working condition. In Kemp v. Workmen's Compensation Appeal Board, 121 Pa.Cmwlth. 23, 549 A.2d 1365 (1988), allocatur denied, 523 Pa. 652, 567 A.2d 655 (1989), the court affirmed the denial of benefits to a claimant who suffered from depression after losing her job as a bookkeeper. The employer had explained to the claimant that her job was being phased out because the company was computerizing its bookkeeping operations. The court held that a layoff resulting from modernization is a normal working condition and that the claimant had not demonstrated her entitlement to benefits.
In Mele v. Workmen's Compensation Appeal Board, 155 Pa.Cmwlth. 65, 624 A.2d 738 (1993), the Commonwealth Court affirmed the denial of benefits to a claimant who suffered from a stress reaction and depression when her position as a medical technologist was eliminated. The claimant was advised by her supervisor that she would be able to continue as an employee, but would have to apply for jobs in the laboratory as they became available. The referee awarded benefits. The Board reversed, finding that the referee had committed an error of law in concluding that the claimant had met her burden of proving that her psychic disability resulted from an abnormal working condition.
The claimant argued on appeal that she was faced with an abnormal working condition caused by the elimination of her job because she was the only employee in the entire department whose employment was placed "in limbo." She felt this way because she was told that her job had been eliminated, but was required to report for work with no defined function or role. The court held that she had failed to establish that her disability was other than a subjective reaction to normal working conditions, stating:

*628 In the every day workplace, employees as here are constantly faced with job changes and even with lay-offs because of changing work procedures or economic conditions. A great number of these changes, although understandably traumatic for the individuals directly affected, can hardly be characterized as anything other than "normal," and are compensated, if at all, by unemployment compensation rather than workmen's compensation.
155 Pa.Cmwlth. at 71, 624 A.2d at 741.
In Birenbaum v. Workmen's Compensation Appeal Board, 159 Pa.Cmwlth. 179, 632 A.2d 1037 (1993), allocatur denied, 537 Pa. 666, 644 A.2d 1203 (1994), the court affirmed the Board's order denying a fatal claim petition filed by the widow of a salesman who had been fired from his job. The salesman had a satisfactory sales record in the New Jersey showroom where he worked. The employer later opened a second showroom and a display area at sites in Pennsylvania, placing the salesman in charge of both. Despite the salesman's hard work, including sales calls on evenings and weekends, the employer's business ventures failed. After being fired, the salesman was hospitalized for depression on two occasions and later committed suicide.
The referee specifically found two work-related factors that caused or aggravated the salesman's psychic injury: (1) his perception of work and its role in his life; and (2) the loss of his job. The referee concluded that his widow had failed to sustain her burden of proving a compensable injury because her husband's suicide was a subjective reaction to normal working conditions. The Board affirmed.
The court noted that it is well established that the fear of losing one's job and actual job loss are normal working conditions, stating,
The fear of losing one's job and even, ultimately, the actual loss thereof, are working conditions associated with almost any employment situation. Therefore, we must conclude that decedent's psychiatric injury was the result of a subjective reaction to normal working conditions. If the work-related *629 stress that produces a mental disability is the result of a subjective reaction to normal working conditions, it is not compensable.
159 Pa.Cmwlth. at 189, 632 A.2d at 1042.
Loss of employment in itself is not an abnormal working condition; nor is the offer of a position of less responsibility as an alternative to unemployment. In this case, the relocation of Wilson's superior precipitated the elimination of her administrative assistant position. Wilson was offered a job as a floater as part of Alcoa's efforts to retain an employee considered to be hardworking and knowledgeable until she secured a permanent position.
Wilson did not suffer any salary reduction or loss of benefits, but suffered emotionally from the loss of the status she enjoyed as an administrative assistant. As a result, she perceived the floater job as mistreatment by her employer. Wilson did not feel challenged by the clerical duties of a floater, but found herself without adequate computer skills to perform the jobs that needed to be filled. She did not update her skills in the two years after her position was eliminated, although she acknowledged that there were changes in the way work was being done due to changing technology.
An employee's perception that a temporary job is demeaning is not a basis for awarding workers' compensation benefits. An employer does not have to place an employee in a position commensurate with the position or status that the employee previously held or bear the risk of a workers' compensation claim for psychic injury. Wilson urges us to interpret "abnormal working conditions" to include any actual change in employment conditions that result in psychic injury. When loss of employment, which would fall within this definition, is not compensable, we can perceive of no reason to extend benefits for continued employment. We decline to encourage a practice of firing employees whose jobs are eliminated when an employer would otherwise be willing to retrain or transfer an employee.
*630 For these reasons, we conclude that the Board's determination that Wilson's psychic injury was not caused by abnormal working conditions is supported by the record. The order of the Commonwealth Court is reversed.
MONTEMURO, J., who was sitting by designation, did not participate in the decision of this case.
NOTES
[*] Mr. Justice Montemuro who was sitting by designation at the time of argument, did not participate in this matter.
[1] Judge Palladino dissented without opinion from the order of the three-member panel.
[2] This case was heard prior to the passage of Act 44 of 1993 in which the title of referee was redesignated as "worker's compensation judge." 77 P.S. § 701.
[3] The room, which was used during proxy season to tabulate votes, was approximately 8 feet wide by 25 feet long. The room had four windows, recessed ceiling lights, carpeting, and air conditioning. A conference table and couch were in the room. Wooden risers and robes belonging to the Alcoa Singers were stored there. Although Wilson's husband described the room as deplorable, the referee concluded that his testimony did not establish that Wilson had been treated in an improper manner. We concur in this assessment after review of the testimony and examination of photographs of the room which were taken by Wilson's husband. We find the room's description to be worthy of mention only because the Commonwealth Court's opinion leaves one with the mistaken impression that the room was a horrible place to work and there was no reason to relocate Wilson there.
[4] Although she complained about the job posting program, Wilson admitted that she had applied for only one job through the program during the period from 1985 to 1987. She applied for a job in the employee benefits department in August or September 1985. The job was filled by someone who was working in that department at the time. Wilson did not apply for any of the 63 jobs that were posted over the two years because they were "less administrative assistant type jobs and more secretarial jobs" and required computer experience.
[5] In her testimony, Wilson admitted that she made a unilateral decision to move into an office that was being used for storage:

A. * * * I located an office on my own and moved my things down and called personnel and told them where they could find me.
Q. Is that the way things are normally done? You go out and find your own office?
A. No.
R. 66a.
[6] The termination letter was not sent until August 28, 1987, because Alcoa had received information of an alleged suicide attempt by Wilson. When Alcoa learned that Wilson had not been hospitalized or injured, the letter was sent.
[7] Alcoa does not dispute that the first part of the Martin test, i.e., that a claimant prove by objective evidence that he has suffered a psychic injury, was met in this case.
[8] The Commonwealth Court attempted to distinguish this case from Martin on the basis that Wilson had introduced evidence of actual employment events that occurred after 1985 during the time that her work status was insecure and her working conditions had changed drastically. 159 Pa.Cmwlth. 296, 307, 632 A.2d 1361, 1366 (1993), fn. 5. We fail to see the distinction. Evidence of actual employment events that resulted in a change of responsibilities was produced in both cases. The evidence in each case failed to establish that the changes in responsibilities constituted abnormal working conditions which caused the psychic injuries.