P.R. HOFFMAN MATERIALS,
Petitioner,

v.

WORKERS' COMPENSATION APPEAL
BOARD (ZEIGLER), Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Dec. 9, 1997.
Decided Feb. 5, 1998.

Perry D. Merlo, Harrisburg, for petitioner.

Fred H. Hait, Carlisle, for respondent.

Before COLINS, President Judge, and SMITH and FRIEDMAN, JJ.

COLINS, President Judge.

P.R. Hoffman Materials (Employer) petitions for review of an order of the Workers' Compensation Appeal Board (Board) affirming the order of the Workers' Compensation Judge (WCJ) granting Mary Jane Zeigler's (Claimant) petition for compensation benefits. We reverse.

Claimant worked for Employer as a production specialist for approximately 26 years until January 6, 1992, when she took a medical leave of absence. On July 29, 1992, Claimant filed a petition for compensation alleging that as of August 1990, she began suffering from a bipolar disorder with psychotic features and/or paranoid schizophrenia, depression, anxiety, nausea, vomiting, sleep disturbance, and crying spells as a result of incidents that occurred at work. Employer filed a timely answer denying the material allegations found in Claimant's petition, and the matter was assigned to the WCJ.

In support of her petition, Claimant presented her own testimony, the testimony of several of her co-workers, and the testimony of Dr. Dennis J. Milke, a Board certified psychiatrist. Claimant testified that in September of 1991, following her report to the Occupational Safety and Health Administration (O.S.H.A.) of alleged health violations in Employer's plant, Employer's management began to harass her. She testified that she was harassed by Employer thereafter regarding her production output, and that she was treated differently from other employees by Employer. Specifically, she stated that she was reprimanded for things other employees were not reprimanded for, that she was not allowed to talk during working hours, and that she was not permitted to use the company phones when other employees could do so. Claimant also testified that she was pushed by another employee at work and that Employer forced her to work in front of an air conditioning unit. Claimant's co-workers also testified that Claimant had been subjected to unequal treatment by Employer. The WCJ found Claimant's testimony and the testimony of her co-workers credible.

Dr. Milke testified on behalf of Claimant before the WCJ. He stated that when he began treating Claimant in December of 1991, she informed him that her problems began near the end of 1989 when she overheard a conversation at work regarding insufficient monies for the company pension fund. She told Dr. Milke that after overhearing this conversation, she became extremely concerned about her future and the money she had put into the retirement fund. Claimant advised Dr. Milke that following several unsuccessful attempts to inquire about this matter with Employer and with her union representatives, she began to lose sleep, became increasingly agitated, was unable to concentrate, and began to think people were talking about her behind her back at work. (Dr. Milke's Deposition, p. 14.) Dr. Milke testified that in his opinion Claimant's overhearing of the foregoing conversation was the triggering event that lead to her current psychic condition. The WCJ found Dr. Milke to be credible.

Based on the credible testimony of Claimant, her co-workers and Dr. Milke, the WCJ found that Claimant was subjected to abnormal working conditions that lead to her current mental condition. Accordingly, the WCJ granted Claimant's petition for compensation. The Board, by order dated May 30, 1996, affirmed.[1]

1. While Employer's appeal was pending before the Board, Claimant filed a penalty petition. The Board addressed this petition in its decision and determined that a remand solely regarding the penalty petition was necessary. Thereafter, Employer filed a petition for review with this Court from the Board's May 30, 1996 order addressing the merits of the Board's decision affirming the WCJ's grant of Claimant's petition for compensation. We quashed this appeal as interlocutory by order dated May 15, 1997. Following resolution of the penalty matters on remand, Employer filed a motion to proceed with its prior appeal on the merits and we entered an order dated June 24, 1997, permitting Employer to file another petition for review of the Board's previous order as of June 9, 1997, the date of the Board's order following remand. Employer filed the within, timely petition for review in response to our June 24, 1997 order.

On appeal to this Court,[2] Employer argues that the Board erred in affirming the WCJ because there was not sufficient medical evidence to establish that the Claimant's injury was caused by her exposure to abnormal working conditions. We agree.

Initially, we note that in a workers' compensation proceeding, the claimant has the burden of proving that his or her injury occurred in the course of employment and was related to that employment. *Cox v. Workmen's Compensation Appeal Board (Brookville Glove Mfg.)*, 144 Pa.Cmwlth. 147, 601 A.2d 404 (1991). The claimant has the burden of establishing the right to compensation and all of the elements necessary to support an award. See *Page's Department Store v. Velardi*, 464 Pa. 276, 282, 346 A.2d 556, 558 (1975).

In a case involving a psychological stimulus causing a mental injury (mental-mental), the work-related stress must be caused by actual objective abnormal working conditions, as opposed to subjective, perceived, or imagined employment events. *Martin v. Ketchum, Inc.*, 523 Pa. 509, 568 A.2d 159 (1990). The degree of proof demanded of a claimant in such cases is high, *Hammerle v. Workmen's Compensation Appeal Board (Department of Agriculture, Bureau of Dog Law Enforcement)*, 88 Pa. Cmwlth. 486, 490 A.2d 494 (1985), and for objective employment events to be considered abnormal, they must be considered in relation to the specific employment, *Williams v. Workmen's Compensation Appeal Board (Philadelphia National Bank)*, 120 Pa. Cmwlth. 551, 548 A.2d 1344 (1988). When, as here, there is no physical injury as a precursor to the psychic injury, the claimant must prove either (a) that actual extraordinary events occurred at work and caused the trauma, and that these specific events can be pinpointed in time; or (b) that abnormal working conditions over a longer period of time caused the psychic injury. *Marsico v. Workmen's Compensation Appeal Board (Department of Revenue)*, 138 Pa.Cmwlth.

352, 588 A.2d 984 (1991). Even assuming that a claimant has proven that he or she suffered a psychiatric injury causally related to his or her employment, benefits may be granted only if the claimant's reaction to the incidents was more than a mere subjective reaction to normal working conditions. *Martin v. Ketchum, Inc.*, 523 Pa. 509, 568 A.2d 159 (1990). Here, Claimant alleged that the conditions at work, to which she and her co-workers testified, were the abnormal working conditions that *caused* her mental illness. In cases of this nature, unequivocal medical testimony is required to establish a causal connection between the injury and the employment. *Andracki v. Workmen's Compensation Appeal Board (Allied Eastern States Maintenance)*, 96 Pa.Cmwlth. 613, 508 A.2d 624 (1986). In order to establish this nexus, Claimant presented Dr. Milke's testimony.

Our review of Dr. Milke's testimony, however, reveals that he failed to causally connect the work incidents to her resulting mental condition. To the contrary, Dr. Milke unequivocally testified that the precipitating event leading to Claimant's current mental state was when she overheard several employees discussing the funding of Employer's pension plan. Dr. Milke gave the following, relevant, testimony:

[I] saw Mrs. Zeigler first on Christmas Eve, 1991. At that time she states that her problems began at the end of '89 when she overheard a conversation at work where, I think, some senior people were saying that they didn't think they had enough money to put in the retirement pension fund. And she became extremely concerned at that point about her future, the monies that she had put into her retirement plan at P.R. Hoffman, where she was employed, and from that began to make inquiries about the stability of the fund and with particular references to how it was going to affect her in years to come when she retired.

Apparently, she proceeded in such—I'm assuming that she proceeded in such a way

---

**2.** Our standard of review is limited to a determination of whether there has been a violation of constitutional rights, errors of law were committed, or whether necessary findings of fact are supported by substantial evidence. *Nevin Trucking v. Workmen's Compensation Appeal Board (Murdock)*, 667 A.2d 262 (Pa.Cmwlth.1995).

that it was an irritant to her employers. She got turned off by them. She then went to the union, felt that the union didn't quite understand the point that she was trying to make and didn't see the issues as being as serious as she did. And, ultimately, she began to lose sleep about this (sic) became increasingly agitated, couldn't concentrate, began to think that people were talking about her behind her back at work, had trouble eating, had trouble sleeping.

(Dr. Milke's March 3, 1993 Deposition, pp. 13–14). Dr. Milke then specifically testified regarding what, in his view, triggered Claimant's mental health problems:

> [T]he pension plan started it. But then what happened was in her attempt—her perception was that in her attempt to find out what actually happened to her money and the money of other employees she talked to people, she talked to supervisors, word got around the company and because of that they designated her as a troubled employee or a troublesome employee and began to treat her badly ... but it started from that conversation [about the pension plan].

(Dr. Milke's April 12, 1993 Deposition, p. 7) (emphasis added). Dr. Milke further explained that Claimant suffered from schizophrenia, which probably affected her prior to her overhearing the pension conversation. He noted, however, that this conversation was the trigger that eventually led to her impaired mental health. He stated the following:

> [A]s I mentioned to you before I suspect that this lady had an ongoing adult schizophrenic process and compensated well with it. In other words, she was able to maintain a house or an apartment, was able to work, keep a job, and did not have any of these florid paranoid perceptions, these delusional perceptions until something—and I can't tell you what the something is—but that's what usually occurs. There's an additional straw that breaks the camel's back. And I'm not sure what her straws

were, but it seemed to have been triggered by that comment about the pension plan. (Dr. Milke's April 12, 1993 Deposition, p. 37).

Dr. Milke then commented on whether he thought Claimant's reaction to the pension plan conversation she overheard was reasonable. He stated:

> Q. Now, this pension plan, she had worked for the company for 25 years and she finds out that there's a potential for the plan being in trouble, not funded enough. And that was the first significant event that brought her to psychological treatment?
>
> A. Um-hum.
>
> Q. Is that reasonable?
>
> A. Is hearing that discussion reasonable to bring somebody to see a psychologist or a psychiatrist?
>
> Q. Or to throw them into a depression?
>
> A. No, I don't know that it's reasonable. I think a lot of companies have difficulty with their pension plans funding (sic), the workplace, and I don't think most of those people wind up seeing someone professionally.

(Dr. Milke's April 12, 1993 Deposition, p. 55–56.) (Emphasis added.)

It is clear, based upon our review of Dr. Milke's testimony, that Dr. Milke was of the opinion that Claimant suffered from a pre-existing mental condition that was triggered when she overheard the pension plan conversation at work. Dr. Milke failed to attribute her mental condition to any of the circumstances testified to by Claimant and her co-workers.

This court has consistently held that an employee's fears over the possible loss of a job, or fears over a company's financial situation, do not constitute abnormal working conditions justifying an award of benefits. Rather, this Court has indicated that these are working conditions associated with almost every employment situation. *See Mele v. Workmen's Compensation Appeal Board,* 155 Pa.Cmwlth. 65, 624 A.2d 738 (1993) (denying benefits to laid off employee who claimed stress as result of her job loss entitled her to benefits); *Birenbaum v. Workmen's Compensation Appeal Board,* 159 Pa. Cmwlth. 179, 632 A.2d 1037 (1993), *petition*

*for allowance of appeal denied,* 537 Pa. 666, 644 A.2d 1203 (1994) (holding that one's fears over losing their job, and ultimate loss thereof, did not justify award of benefits where psychic injury was alleged); *Klein v. Workmen's Compensation Appeal Board (Plaza Home Center, Inc.),* 91 Pa.Cmwlth. 247, 496 A.2d 1346 (1985) (determining that where alleged mental disability arose from threat of financial difficulties in connection with corporation in which claimant had an ownership interest, benefits were not warranted as no work-related injury was established); *McCoy v. Workmen's Compensation Appeal Board (McCoy Catering Services, Inc.),* 102 Pa. Cmwlth. 436, 518 A.2d 883 (1986), *petition for allowance of appeal denied,* 517 Pa. 595, 535 A.2d 84 (1987) (affirming the denial of fatal claim benefits to widowed claimant whose husband's psychological stress and resulting suicide was derived from inability to support his family as result of his failing catering business).

Based on the foregoing, we conclude that Claimant's reaction to overhearing the conversation concerning the company pension plan was merely her subjective reaction to normal working conditions. As noted by Dr. Milke, this conversation triggered her subsequent mental health problems, and, in his view, her reaction to this conversation was not the reaction of a reasonable person. Thus, we hold that the Board erred in affirming the WCJ's decision and order, and we reverse the same.