**Dorothy McKINNEY, Petitioner,**

v.

**WORKERS' COMPENSATION APPEAL BOARD (DECISION DATA), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Feb. 11, 2000.

Decided May 30, 2000.

Howard P. Rovner, Feasterville, for petitioner.

Kate A. Smith, Philadelphia, for respondent.

Before DOYLE, President Judge, FRIEDMAN, J., and MIRARCHI, Jr., Senior Judge.

MIRARCHI, Jr., Senior Judge.

Dorothy McKinney (Claimant) petitions for review of an order of the Workers' Compensation Appeal Board (Board) that reversed a decision of a workers' compensation judge (WCJ) granting, for a closed period, Claimant's claim petition seeking compensation for a work-related mental disability. We reverse.

Claimant worked for Decision Data (Employer) as a dispatch operator from 1990 until she left on disability in January 1992. Her duties involved answering telephone calls from customers and engineers and filling out reports. On January 23, 1992, Claimant had an incident with her supervisor, Jack Dinan, which she alleged

caused a work-related mental disability. In January 1995, Claimant filed a timely claim petition seeking benefits, which petition was opposed by Employer. The matter came before the WCJ who received testimony from Claimant and her medical witness and Employer's medical witness. The WCJ's relevant findings of fact and conclusions of law are summarized below.

Claimant testified to the following. On or about Friday, January 16, 1992, she and some co-workers were told by a floor supervisor, Velvet Howard, to remove posters of Martin Luther King, Jr. and John F. Kennedy that had been hanging in their work cubicles. On Monday, January 19, 1992, Claimant's supervisor, Mr. Dinan came out to her workstation and told her to get off of the phone and come into his office immediately. After she went into his office, he locked the door and began yelling and screaming, accusing her of complaining to another manager, Phylis Smith, an African American, about having to take the posters down. Apparently Ms. Smith had informed Mr. Dinan that it was not against Employer's policy for its employees to hang such posters in their workstations. Mr. Dinan called Claimant a "bigot bitch" and threw things about the room, including pencils, pens, and an ashtray. Finally, Mr. Dinan threatened her should she tell anyone about this encounter.[1] Ms. Howard was also in the office at the time, and neither said anything to Mr. Dinan because of the extent of his anger.

Claimant went back to her workstation after the encounter, finished her shift, and continued to work her hours through Thursday, January 22, 1992. She had no altercations with Mr. Dinan before this episode or afterwards. On the evening of January 22, 1992, however, Claimant and her husband kept a pre-scheduled regular medical appointment with their family physician, Dr. Wingrad, at which time Claim-

ant "completely broke down," experienced chest pains, and requested help. Dr. Wingrad administered an EKG and ordered that Claimant be taken off work. Claimant called off work on Friday, January 23, 1992 and reported the incident with Mr. Dinan to Employer's human resources division the following week. Dr. Wingrad referred Claimant to a facility called Psych Resources, where she treated with various psychologists and psychiatrists from January 28, 1992 until June 21, 1995. She has been unable to return to work since her last day of January 22, 1992 because of ongoing psychological problems, including suicidal thoughts and a fear of going out into public because of the anxiety that "somebody's going to push me off the thing or do something to me." Finding of Fact No. 16. Claimant received short term and long term disability benefits from a 100% Employer-sponsored program at various rates from January 23, 1992 until June 23, 1994.

Edward Urban, M.D., a certified psychiatrist who had worked at Psych Resources, testified on behalf of Claimant as follows. He first saw Claimant for treatment on August 3, 1994 after other psychiatrists at Psych Resources had treated her. Claimant's history revealed that she became tremendously upset, anxious, and depressed as a result of the incident with Mr. Dinan on January 19, 1992. Claimant also had a history of prior incidents of depression approximately ten years before the work altercation occurred, which incidents lasted for several months and then resolved. Claimant also experienced sleep disturbance for approximately six months prior to the work incident, and had feelings of depression since Christmas 1991. The physicians and therapists at Psych Resources initially diagnosed Claimant as suffering from adjustment disorder with mixed emotional features, and during her initial treatment Claimant developed signs

---

1. Claimant's testimony regarding the threat was as follows: "[H]e told me that I could not tell anyone, HR, human resources, anyone in our department, my husband, or anyone, or else I'd have a lot of problems." Notes of Testimony, May 2, 1995, p. 7. Claimant further testified that Mr. Dinan made this threat two or three times. *Id.*, p. 8.

of excessive suspiciousness, paranoia, panic attacks, and agoraphobia (avoiding people in crowds). Because of her worsening symptoms, Claimant was diagnosed as suffering from a major depression with intermittent paranoia. Anti-psychotic medication did not bring relief to her symptoms. On Claimant's last visit with Dr. Urban on June 21, 1995, he diagnosed her condition as a major depression, single episode, severe, with intermittent psychotic features (*i.e.*, paranoia), and panic disorder with severe agoraphobia. Dr. Urban opined that Claimant's condition was causally related to the January 19, 1992 work incident which exacerbated a pre-existing mental condition and which continued to worsen through her period of treatment. Dr. Urban further opined that Claimant was disabled from performing her work duties since January 23, 1992 as a result of the work injury.

Employer presented the testimony of Timothy Michals, M.D., who is board certified in psychiatry, forensic psychiatry, and quality assurance and utilization review. He examined Claimant on July 24, 1996 and reviewed her medical records. Dr. Michals testified that his examination revealed no evidence of anxiety, depression, or psychotic features and that Claimant had fully recovered from any psychiatric injury and disability as of July 24, 1996. Dr. Michals did admit that the work incident that Claimant described could have had an impact on her pre-existing condition.

The WCJ found the testimony of Dr. Urban to be credible and persuasive to the extent that Claimant suffered a disabling psychiatric injury as a result of the January 19, 1992 work incident. The WCJ rejected Dr. Michals' testimony and opinion to the extent that it conflicted with that of Dr. Urban. The WCJ did, however, find Dr. Michals testimony to be credible

to the extent that it established that Claimant had fully recovered from any psychiatric work injury as of July 24, 1996, noting that Dr. Urban could only speculate as to any assessment of Claimant's disability after her last visit of June 21, 1995. The WCJ further found Claimant to be a credible and persuasive witness regarding the events of January 19, 1992 and the subsequent onset of her disabling symptoms and condition. The WCJ noted that Employer did not place any evidence on the record to contradict what had occurred on January 19, 1992.

Based upon these findings of fact, the WCJ determined that Claimant suffered a work-related psychiatric injury that aggravated a pre-existing condition to the extent that she became totally disabled from her job from January 23, 1992 until July 24, 1996. The WCJ further found that the January 19, 1992 work incident constituted an objectively abnormal working condition. Accordingly, the WCJ granted Claimant's claim petition for a closed period of time, giving Employer credit for benefits Claimant received under Employer's disability plans.

On appeal, the Board reversed, noting that under current case law, a single episode of criticism coming from a supervisor is not an extraordinary event or an abnormal condition sufficient to justify an award of benefits for a mental disability. *See Philadelphia Newspapers, Inc. v. Workmen's Compensation Appeal Board (Guaracino)*, 544 Pa. 203, 675 A.2d 1213 (1996). Because Claimant only described one incident, the Board reversed. Claimant then filed the present petition for review.[2]

Claimant argues that the WCJ erred by reversing the WCJ's decision for alternative reasons. First, Claimant argues that her disability did not arise from a single episode of criticism. Alternatively, if her disability arose from one episode of criti-

2. This Court's scope of review in a workers' compensation case is whether necessary findings of fact are supported by substantial evidence, whether errors of law have been committed, or whether constitutional rights have been violated. *Sears, Roebuck & Co. v. Workers' Compensation Appeal Board (Lear)*, 707 A.2d 618 (Pa.Cmwlth.1998).

cism, it was an event of such magnitude as to constitute an abnormal working condition. Employer argues that all that transpired was a single isolated incident of criticism behind closed doors and that Claimant's relationship with her supervisor was "fine" after the incident.

In order to recover workers' compensation benefits for a psychic injury, a claimant must prove by objective evidence that he or she has suffered a psychic injury and that such injury is other than a subjective reaction to normal working conditions. *Martin v. Ketchum, Inc.*, 523 Pa. 509, 568 A.2d 159 (1990). Thus, a claimant must show that the mental injury was caused by abnormal working conditions. *Philadelphia Newspapers*. "[P]sychic injury cases are highly fact-sensitive and for actual working conditions to be considered abnormal, they must be considered in the context of the specific employment." *Wilson v. Workmen's Compensation Appeal Board*, 542 Pa. 614, 624, 669 A.2d 338, 343 (1996). Whether a WCJ's findings of fact support a conclusion that the claimant has been subject to abnormal working conditions is a question of law fully reviewable on appeal. *Id.*

In *Philadelphia Newspapers*, the claimant was employed as a delivery truck driver for the Philadelphia Daily News. He alleged that he suffered a severe anxiety reaction and depression as a result of harassment inflicted upon him by his superiors, rendering him disabled. The incident of harassment occurred on a single day. On that day, a bundle of newspapers had fallen out of the back of the claimant's truck as a result of his leaving the truck door open. He made no attempt to retrieve the newspapers and instead reported the loss to his employer, requesting a credit for the papers so that he did not have to pay for them. After the claimant finished the first leg of his route, he arrived at a designated pick-up spot to load more papers that had been left on the street because the claimant was operating behind schedule. Waiting for the claimant

were two supervisors. The claimant asked if they had received his report of the lost papers, and one replied: "Yeah. But f— you. You're not getting it." The claimant understood this remark to mean that he would not receive credit. When one supervisor attempted to help the claimant load his newspapers, the claimant insisted that he stop, saying that he would not be pushed. Both supervisors then cursed him, calling him derogatory names. At the claimant's next stop, he was again met by his supervisors who had apparently followed him. There, the supervisors questioned the claimant about complaints they had received concerning pressure the claimant, as a union steward, was making upon them to request overtime in response to recent cutbacks in the number of delivery trucks. When the claimant stated that he did not know what they were talking about, one supervisor called him "a f idiot shop steward." For several minutes, the supervisors joked with each other, telling the claimant not to leave. After the claimant resumed his duties, he felt dizzy and requested that another driver complete his route. Thereafter, the claimant sought mental treatment.

The WCJ concluded that the claimant, together with supporting psychiatric testimony, had proven a work-related psychic injury arising from an abnormal working condition: *i.e.*, the treatment he received from his supervisors on this one occasion. This Court affirmed the WCJ. The Supreme Court, however, held that we erred by holding that a single episode of criticism by a supervisor who uses vulgar language, outside the presence of co-workers, constituted an abnormal working condition. Moreover, the Supreme Court noted that the supervisors' criticism of the claimant's shortcomings and behavior was "concededly" reasonable, narrowing the issue to whether the use of obscenities in the course of their criticism created an abnormal working condition. The Court further stated:

In assessing whether work conditions are abnormal, we must recognize that the work environment is a microcosm of society. It is not a shelter from rude behavior, obscene language, incivility, or stress. While we do not suggest that insensitive behavior is socially acceptable in the work place, it is unrealistic to expect that such behavior will not occur. Where, as here, the evidence demonstrates that the offensive behavior complained of is an isolated incident, we must conclude that an abnormal working condition has not been established.

*Id.* at 215, 675 A.2d at 1219. The Court then contrasted the facts of this case with those where benefits had been awarded for psychic injuries following repetitive harassing criticism of the claimant by supervisors over a period of time. Finally, the Court noted "that inappropriate behavior of supervisors *that does not constitute an abnormal working condition* may best be redressed within the confines of the work environment itself, rather than remedied by the system of workers' compensation benefits." *Id.* at 217–18, 675 A.2d at 1220 (emphasis added).

Claimant's argument that her disability did not arise from a single episode of criticism is crafted by enumerating the various acts of Mr. Dinan on January 19, 1992. That is, he (1) ordered Claimant into his office, (2) locked the door, (3) screamed and yelled at Claimant, (4) called her a "bigot bitch," (5) threw objects about the room, and (6) threatened that Claimant would suffer problems if she told others about the event. Although this is an accurate delineation of what the WCJ found to have occurred that day, it nevertheless occurred in a single incident. Moreover, the events that occurred to the claimant in *Philadelphia Newspapers* could similarly be broken down, yet our Supreme Court determined that the claimant in that case suffered a single episode of criticism.

Nevertheless, what the WCJ found to have occurred was more than an episode of *criticism*. In this case, aside from verbal criticism, abuse, and derogatory epithets, Claimant, a female employee, was locked in an office by a male supervisor with another female employee, was identified as the object of the supervisor's rage in the presence of another employee, was present as the supervisor hurled objects about the room in his rage, including an ashtray, and received threats from the supervisor should Claimant divulge what had transpired. Moreover, the object of the supervisor's rage and criticism leveled against Claimant had nothing to do with Claimant's work performance.

■ *Philadelphia Newspapers* is not to be read as establishing a rule that an employer is permitted "one free outburst" prior to its becoming liable for a worker's psychic injury. The character of the event must be taken into account.[3] As the Supreme Court has instructed, it must be remembered that working conditions, in order to determine whether they are abnormal, must be considered in the context of the specific employment. *Wilson.* In *Philadelphia Newspapers*, the claimant was a truck driver and a union steward. It could not be considered unusual, no matter how undesirable, for this individual to experience rough language and derision during the course of his employment. By contrast, Claimant worked as a dispatch operator for a data company. Her experience with such behavior would be considered far less likely. This is not to say, however, as the Supreme Court noted in *Philadelphia Newspapers*, that she is to be immune in her working environment from "rude behavior, obscene language, incivility, or stress." Where that rude behavior, obscene language, incivility, and stress is accompanied, however, with being confined

---

**3.** Certainly, if a supervisor accompanied a venting of anger against a worker with threats of injury or death, we would not hold that *Philadelphia Newspapers* requires that such

behavior be repeated over a period of time in order to qualify as an abnormal working condition.

behind a locked door with an enraged supervisor hurling dangerous objects around the room, and receiving threats against telling anyone else about the encounter, the workplace becomes something more than a microcosm of society. We may all expect to be accosted in society by uncivil, even angry behavior, over matters not of our own creating and foreign to our general business. We do not, however, expect to be confined by a superior who vents his anger with physical threats (the hurling of objects) and other unspecified threats should the superior's behavior be reported to others at work or even one's spouse. This is not a normal condition in our society, nor is it one in the workplace. Thus, it is not the criticism that Claimant received, even for a matter not related to her work duties, that constituted an abnormal working condition, but the entire confluence of events that occurred to Claimant on January 19, 1992.

The Board's conclusion that Claimant is ineligible for benefits for a psychic injury because she only experienced a single episode of "criticism" is thus both factually incorrect and an over-simplified legal interpretation of *Philadelphia Newspapers.* Accordingly, the Board's order must be reversed, and the decision of the WCJ reinstated.

### ORDER

AND NOW, this 30th day of May, 2000, the order of the Workers' Compensation Appeal Board (Board) in the above-captioned matter is hereby reversed, and the decision of the workers' compensation judge is hereby reinstated.